UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

MARCUS SMITH,

    Defendant.

Case No. 22-20073
Honorable Laurie J. Michelson

---

**OPINION AND ORDER DENYING MARCUS SMITH'S DELAYED
MOTION FOR NEW TRIAL [69]**

---

Marcus Smith went to trial on the charge of being a felon in possession of a firearm. The government presented a straightforward case. Two eyewitnesses testified that Smith, an admitted felon, had a gun that he discharged. An investigating police officer found a cartridge casing at the scene. Firearms experts testified that the casing and the gun from which it was likely fired were not manufactured in Michigan. Finding the elements of 18 U.S.C. § 922(g) satisfied, the jury returned a verdict of guilty.

Smith, through his third appointed counsel, now seeks a new trial. He believes his trial counsel was deficient in failing to call certain witnesses. But he primarily asks the Court to second-guess his counsel's trial strategy and engage in the type of Monday-morning quarterbacking the law frowns upon. His challenges to the jury instructions and weight of the evidence also fail to overcome the stringent burden for a new trial.

Thus, the motion is DENIED.

## I.

The Court recites the facts from the relevant trial testimony.

On October 31, 2018, Marcus Smith was residing with his former partner, Yolanda James, in her home in Detroit. (ECF No. 64, PageID.561–562.) Smith and James were working on reconciling their relationship. (*Id*. at PageID.560–561). And James was battling cancer at the time. (*Id*. at PageID.519.) Her close friend Ronald Johnson was helping to take care of her. (*Id*. at PageID.519–520.) This included picking up James and her son in the morning and taking her son to school. (*Id*. at PageID.517–518; 564–565.)

When Johnson arrived at James' residence on the morning of October 31, Smith confronted him about not getting to the house early enough. (*Id*. at PageID.520.) Smith expressed concern about his son being late for school—even though Johnson had never taken Smith's son to school before and did not expect Smith to be at James' home. (*Id*. at PageID.525–526.) Johnson replied that Smith would need to "take that up" with James. (*Id*. at PageID.526.)

According to Johnson, Smith then went back into the house, and when he came out "[h]e had the Glock, black Glock in his hand. I just heard, 'Pow!'" (*Id*.) Johnson further testified that "I was looking at my phone, so I didn't see him, like, walk out with the gun. But when I heard the shot, it was basically, like, aiming toward the sky in front of the vehicle and then that's when I ducked down in the seat." (*Id*. at PageID.521, 532–533.) James then came out of the house and started screaming at

2

and hitting Smith. (*Id*. at PageID.521.) Smith eventually retreated into the home and James and Johnson left. (*Id*.)

James also testified that Smith had a gun. But a few details differed in her version of what transpired. She testified that Smith was agitated that Johnson had her car. (*Id*. at PageID.563.) She further explained that after she got them ready for school, the children— James' son and grandson and Smith's son—left the house and got into the car with Johnson. (*Id*. at PageID.571, 577–578.) At that point, Smith was standing at the car's side door. (*Id*. at PageID.563.) He pulled out a firearm, pointed it at the windshield, raised it up in the air (*id*. at PageID.563, 568–570), and "let off a shot" (*id*. at PageID.569). James got out of the car and confronted Smith. (*Id*. at PageID.563, 570.) She told him to leave. (*Id*.)

After dropping the children off at school, James and Johnson reported the incident to the police. When law enforcement officers came to James' home to investigate further, they recovered a Winchester Smith & Wesson .40 caliber shell casing in the driveway near where James said Smith had been standing. (*Id*. at PageID.543–551; *see also* ECF No. 69-5.)

## II.

More than three years later, Smith was indicted on one count of being a felon in possession of a firearm and ammunition. (ECF No. 11.) The case proceeded to trial and Smith was convicted on March 23, 2023. (ECF No. 49.) After the jury returned its verdict, the Court indicated it would give the parties 30 days to file post-trial motions. (ECF No. 65, PageID.697.)

3

Shortly thereafter, Smith docketed letters complaining about his trial counsel's performance, including his failure to subpoena certain witnesses. (ECF Nos. 52, 55.) The Court treated the letters as a request for new counsel. Smith's counsel also filed a motion to withdraw. (ECF No. 57.) Smith then filed another letter advising of his desire to file a pro se motion for ineffective assistance of counsel. (ECF No. 60.) On May 11, 2023, the Court held a hearing and appointed new counsel for Smith. (ECF No. 59.) The parties then stipulated to adjourn the sentencing "as more time is needed for new defense counsel Sidney Kraizman to investigate as to a possible delayed motion for new trial." (ECF No. 67.)

On August 11, 2023, Smith finally filed a "delayed motion for new trial" through counsel. (ECF No. 69.) The government opposed the motion. (ECF No. 74.) After the motion was fully briefed, the Court held a limited evidentiary hearing on trial counsel's decision to not call Charlene Lee as a witness. The motion is now ready for ruling.

## III.

The Court begins with a procedural issue. The government says the motion for new trial is untimely and should be denied on that basis alone. (ECF No. 74, PageID.872.)

A criminal defendant has fourteen days after his conviction to move for a new trial. Fed. R. Crim. P. 33(b)(2). This deadline, however, may be extended in a case of "excusable neglect." Fed. R. Crim. P. 45(b)(1)(B). The Sixth Circuit has adopted the Supreme Court's definition of excusable neglect in the Rule 33 context. See *United*

4

*States v. Munoz*, 605 F.3d 359, 367–69 (6th Cir. 2010) (citing *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993)). Smith relies on the Sixth Circuit's weighing of the relevant factors in *Munoz* to argue excusable neglect for his motion's delay. (ECF No. 69, PageID.742; ECF No. 83, PageID.981–984.) The government relies on the Sixth Circuit's analysis of those same factors in *United States v. Elenniss*, 729 F. App'x 422, 426 (6th Cir. 2018) to argue the motion is untimely. (ECF No. 74, PageID.872–880.) On this record, Smith has the better argument.

Immediately after his trial, Smith made it known that he intended to challenge his conviction based on the alleged ineffective assistance of his counsel. (*See* ECF Nos. 52, 55.) Ultimately, trial counsel withdrew. (ECF Nos. 57, 59.) Smith's newly appointed counsel obtained the trial transcripts and began working on a motion. And in their request to adjourn the sentencing the parties put the Court on notice that there might be a delayed motion for new trial. (ECF No. 67.) Thus, the government did not have to misallocate any resources—i.e., expend resources toward sentencing considerations rather than toward responding to Smith's post-verdict motion—because of Smith's delay. *Elenniss*, 729 F. App'x at 426.

As for prejudice to the government from any delay in a potential new trial, the Court appreciates that Yolanda James has significant health issues. And the government had difficulty securing the testimony of James and Johnson and had to bring them to court on material witness warrants. But this was due in large measure

5

to the government's three-year delay in bringing these charges. Thus, the Court will accept the delayed motion for new trial and address the merits.

## IV.

Federal Rule of Criminal Procedure 33 states that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The defendant bears the burden of proving the need for a new trial and such motions should be granted sparingly and with caution." *United States v. Turner*, 995 F.2d 1357, 1364 (6th Cir. 1993). Smith's claims of need are ineffective assistance of counsel, error in a jury instruction, and the verdict being against the manifest weight of the evidence. (ECF No. 69.) None persuade.

## A.

"A violation of [a defendant's] Sixth Amendment right to effective assistance of counsel clearly meets [the interest-of-justice] standard." *Munoz*, 605 F.3d at 373. Under *Strickland v. Washington*, counsel's performance violates the Sixth Amendment only where "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." 466 U.S. 668, 686 (1984). To meet this standard, Smith must establish (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced his defense. *Id*. at 687. Counsel's performance is considered deficient only where "the identified acts or omissions were outside the wide range of professionally competent assistance," as determined by "prevailing professional norms." *Id*. at 690.

In reviewing the adequacy of counsel's performance, the Court must "indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged conduct might be considered sound . . . strategy." *Id.* at 689; *see also Logan v. United States*, 434 F.3d 503, 510 n.1 (6th Cir. 2011) (noting that a defendant's burden of overcoming the general presumption is even greater when counsel's conduct involves "strategic decisions," which are viewed as "virtually unchallengeable"). And the court "must take care to avoid 'second-guessing' strategic decisions that failed to bear fruit." *Lundgren v. Mitchell*, 440 F.3d 754, 769–70 (6th Cir. 2006) (quoting *Strickland*, 466 U.S. at 689). To establish prejudice, Smith must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694.

Smith argues that his trial counsel's assistance was ineffective in that he failed to (1) call witnesses to impeach the credibility of James and Johnson as to alleged prior inconsistent statements and (2) cross-examine the government's firearm expert, or retain an expert of his own, about "ghost guns" that may look like Glock guns. The Court will address the arguments in turn.

### 1.

After the shooting incident, James and Johnson went to the police station. Officer Monique Swartz interviewed Johnson and prepared an incident report. Later, Sergeant Kevin Jackson went to James' home to look for Smith and conduct a follow-

up investigation. Smith contends his counsel was deficient in failing to call officers Swartz and Jackson as witnesses to impeach the credibility of James and Johnson based on their prior inconsistent statements. (ECF No. 69, PageID.748.)

> Start with officer Swartz. Her police report contained the following narrative:

> I talked to the victim who stated that he was picking up his friend's (IO) son to take him to school. Victim stated that the offender who is the IO's ex boyfriend approached his vehicle stating "You need to hurry up, my son needs to get to school early." Victim stated to offender "I don't know about taking your son to school. You need to talk to her. Victim stated that he never met the offender or the offender's son. Offender got angry and produced a handgun pointing the gun at the victim. Offender then pointed the gun in the direction of a vacant building and fired two shots. IO then jumped out of the vehicle stating "what are you doing. You need to leave." Offender then went into the above location. Victim and IO left the location.

(ECF No. 69-2.) This account was consistent with Johnson's trial testimony, aside from the reference to two shots being fired. At trial, Johnson testified that he heard one shot. (ECF No. 64, PageID.521.) Smith's counsel was aware of this discrepancy and cross-examined Johnson on it. He asked Johnson, "Didn't you tell the police Smith fired two shots at a vacant building?" to which Johnson replied, "No." (ECF No. 64, PageID.535.) So counsel created the inference of an inconsistency rather than calling Swartz to make it explicit. Smith is correct to point out that the Court instructed the jury that a lawyer's questions are not evidence. But the Court also instructed the jurors that they could make reasonable inferences and use their common sense. (ECF No. 48.)

As the government pointed out, it was reasonable for Smith's trial counsel to proceed in this manner as there were drawbacks to calling officer Swartz, namely

that she would have corroborated Johnson's testimony about Smith's firearm possession. (ECF No. 74, PageID.883.) Put another way, it is reasonable trial strategy, especially in a felon in possession case, to not focus the jury on the number of shots that may have been fired by someone possessing a firearm. *See United States v. Bass*, 460 F.3d 830, 839 (6th Cir. 2006) (finding reasonable trial strategy not to cross-examine certain witnesses by dwelling on potentially unfavorable testimony). And the risk/reward calculation of calling officer Swartz—might the jury disbelieve Johnson completely based on the discrepancy in the number of shots he said Smith fired or might it simply reinforce that Smith possessed a firearm irrespective of the number of shots he fired—is for trial counsel, and not this Court, to make. *See Rayborn v. United States*, 489 F. App'x 871, 878 (6th Cir. 2012) (reiterating that the decision whether to call a witness is a "classic question[] of trial strategy that merit[s] *Strickland* deference").

The same is true for the decision not to recall Sergeant Jackson in Smith's case in chief. During James' testimony, she recalled that Smith fired his weapon straight up in the air. And on cross-examination, she testified that she never told Sergeant Jackson that Smith was firing a shot at her. (ECF No. 64, PageID.578–579.) This was inconsistent with a sentence in Sergeant Jackson's incident report that "[James] stated that the offender fired a shot at her from a firearm while she was inside of a vehicle and stood in her driveway near the backyard." (ECF No. 69-5.) Smith says his counsel should have called Sergeant Jackson to point out this discrepancy. Again, the Court cannot say it was an unreasonable strategic decision, in a felon in possession

case, to not call a witness to point out an inconsistency about how the defendant may have used the firearm. Sergeant Jackson, like officer Swartz, would have corroborated Smith's firearm possession. So the Court can understand counsel's decision to not call him.

In sum, four years after the incident, Johnson and James may have had different recollections about how many shots Smith fired or whether he pointed the gun in the air or at them before he fired it. But their versions and the officers' contemporaneous incident reports all recounted Smith possessing a firearm. Rather than have that testimony reinforced by law enforcement witnesses, Smith's counsel focused on the inconsistencies between the testimony of James and Johnson. The Court cannot say that fell outside the range of reasonable professional assistance.

And even if it was deficient performance to fail to call these witnesses, Smith has not shown prejudice. He simply asserts that had these witnesses been called there is a reasonable probability the result of the trial would have been different. (ECF No. 69, PageID.759.) But why? The government acknowledged throughout the trial that there were some inconsistencies between Johnson and James' accounts, and that did not influence the verdict. And Smith's counsel, through cross-examination, planted the seed about other inconsistencies. If the jury had heard additional testimony about James and Johnson reporting that Smith fired one shot or two, or had pointed the gun at the car or in the air, it does not seem likely it would have changed the jury's decision about whether Smith possessed a firearm or ammunition.

Thus, the failure of Smith's counsel to call officers Swartz and Johnson does not warrant a new trial.

## 2.

Smith also faults his trial counsel for failing to subpoena Charlene Lee as a witness. Lee is a friend and former neighbor of James. She provided an affidavit in support of Smith's motion for new trial, averring that "Yolanda James said to me that Marcus did not shoot at the other guy and did not have a gun." (ECF No. 69-3.) She was also prepared to testify that she often heard gunshots in the neighborhood. (*Id.*) The government's understanding, expressed in its response brief, was that "trial counsel interviewed Charlene Lee and made a strategic decision not to call her as a witness." (ECF No. 74, PageID.884.) Lee's affidavit suggested a call with trial counsel but no follow-up. (ECF No. 69-3.) The Court found that this claim of ineffective assistance would benefit from further exploration and conducted a limited evidentiary hearing. (ECF No. 84.)[1]

"Under *Strickland*, trial counsel has a duty to investigate his case." *Stewart v. Wolfenbarger*, 468 F.3d 338, 356 (6th Cir. 2006). "This duty includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence." *Id.* (quoting *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005)). "[I]n the context of asking whether counsel adequately investigated his client's defense, the ultimate inquiry is whether the choice not to conduct additional

---

[1] Smith's other claims for new trial either did not involve supporting affidavits or presented questions of law that did not require additional evidence.

11

investigation was 'reasonable[] in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" *Bigelow v. Haviland*, 576 F.3d 284, 287 (6th Cir. 2009) (quoting *Strickland*, 466 U.S. at 691). In other words, "an attorney's failure to present available exculpatory evidence is ordinarily deficient, unless some cogent tactical or other consideration justified it." *Caldwell v. Lewis*, 414 F. App'x 809, 815–16 (6th Cir. 2011) (quoting *Pavel v. Hollins*, 261 F.3d 210, 220 (2d Cir. 2001)).

Smith's trial counsel, John Brusstar, testified that he made a strategic decision not to call Charlene Lee as a witness. For starters, he cited the fact that Lee did not approach him about testifying nor did Smith disclose her. Instead, Brusstar learned about Lee from the government. A few weeks before trial, the government produced to the defense the following email it received on March 9, 2023, from Task Force Officer Dianna Napier:

> On 03-07-2023, while waiting for Yolanda James to be seen at duty court [on the material witness warrant], Yolanda stated that Marcus Smith tried to send a message to her from an old neighbor named Charlene Lee. Ms. James said that Ms. Lee told her that Marcus Smith was trying to get in contact with her. Ms. James said that Ms. Lee got the information from Marcus Smith's child's mother to relay the message to Ms. James.
>
> I spoke with Charlene today (03-09-2023) . . . via phone. Ms. Lee said that Marcus Smith calls her husband William all the time. At times, Marcus Smith will ask William to speak with Ms. Lee. Ms. Lee said she had a conversation with Marcus about why he is locked up. Marcus Smith told Ms. Lee that he is facing a lot of time and asked Ms. Lee to get in contact with Yolanda. Marcus told Ms. Lee that Yolanda needs to tell the attorneys the truth to what really happened. Ms. Lee stated that when Yolanda lived down the street on Evanston, it was always stuff happening down there and she heard Yolanda and the other guy got into an argument with Marcus on the fourth of July when the shots was allegedly fired. Ms. Lee told Yolanda that she is going to have to tell the truth to what happened because it is not right that Marcus is locked up.

> Ms. Lee stated that Yolanda told her that Marcus did not have a gun and that it's on him and the attorneys.

(ECF No. 69-4; Dec. 5, 2023, Evid. Hrg., Exh. A.)

After reviewing this discovery shortly before trial, Brusstar immediately had concerns. First, the reference to Marcus asking Lee to "get in contact with Yolanda" and instruct her what to tell the attorneys sounded to Brusstar like potential witness tampering or obstruction. He was also worried it would appear as if Smith and Lee were "in cahoots" to come up with a story, thereby affecting Smith's credibility. Second, Lee was wrong about the date of the incident—it was October 31, 2018, and not July 4. Brusstar was therefore concerned that Lee was referencing another incident between Marcus Smith and Ronald Johnson that took place in the summer of 2019, months after the shooting incident. According to an FBI report by TFO Napier, Smith allegedly tried to stab Johnson with a kitchen knife during that later incident. (Dec. 5, 2023, Evid. Hrg., Exh. B.) The FBI report was disclosed to defense during discovery and Brusstar did not want to put on any evidence that could open the door at trial to this other violent incident involving Smith. Moreover, no one was aware of Lee until James told TFO Napier about her. So also lurking, as raised by the government, was the question of why James would "give the government the name of the person to whom she allegedly made an inconsistent and exculpatory statement." (ECF No. 74, PageID.884–885.)

Brusstar, however, did not ignore the contents of Napier's email. He understood why it might be important to Smith's case. So Brusstar called Lee at the number listed in the email to investigate the information in Napier's report. Brusstar

and Lee spoke for 10–15 minutes and Lee repeated what was set forth in the email—that James told her Smith did not have a gun and that she thought the incident occurred sometime in the summer. Lee testified to the same at the evidentiary hearing.

After calling Lee and consulting Smith, Brusstar still had the same concerns. So he decided not to call Lee as a witness, thinking it best not to risk opening the door to questions about Smith attempting to stab Johnson. Brusstar testified that it would have been too damaging to their case to have this incident come in. This was a strategically defensible choice made after reasonable investigation. It is not deficient performance. *See United States v. Six*, 600 F. App'x 346, 351 (6th Cir. 2015) (finding counsel's decision not to call witness with potentially exculpatory testimony strategic and reasonable where counsel made the decision after calling and speaking with the witness to determine whether he would be helpful to defendant's case); *Jackson v. Bradshaw*, 681 F.3d 753, 761 (6th Cir. 2012) (finding no deficient performance where counsel found the risk of calling a potentially helpful witness "to be too great").

Thus, the failure to call Lee does not warrant a new trial either.

### 3.

Next, Smith complains about his counsel's handling of the firearm experts. (ECF No. 69, PageID.764.)

A conviction for being a felon in possession of a firearm requires the government to prove beyond a reasonable doubt that the defendant was a felon and was aware of that fact, that the defendant knowingly possessed a firearm, and that

the firearm traveled through interstate commerce. *United States v. Ward*, 957 F.3d 691, 696 (6th Cir. 2020) (citing *Rehaif v. United States*, 139 S. Ct. 2191, 2200 (2019)). Smith's trial centered on the latter two elements.

James and Johnson testified that Smith discharged a firearm. Johnson believed it was a Glock. Sergeant Jackson testified that he located a Winchester Smith & Wesson .40 caliber shell casing in James' driveway near where she said Smith was standing when he fired the gun. The government called two firearm and ammunition experts to establish that this piece of ammunition, and the gun that could have fired it, traveled in interstate commerce.

The first, Shelby Szymoniak, is a forensic scientist in the firearm and tool mark unit of the Michigan state police. (ECF No. 64, PageID.585.) She testified that Glock and Smith & Wesson are the two main firearms that could have made the markings on the head stamp of the recovered casing. (ECF No. 64, PageID.603.) On cross-examination, however, she admitted that, with no gun retrieved, the type of weapon that was fired was conjecture and "[i]t could be a large number of firearms that could have fired [the cartridge]." (*Id.* at PageID.609.)

Next was Jamie Pharr, an interstate nexus agent for the ATF. (*Id.* at PageID.611.) He testified that the head stamp of the shell casing was marked with Winchester and .40 caliber Smith & Wesson, that the two Winchester plants where ammunition is manufactured are not located in Michigan, and thus that the ammunition would have traveled in interstate commerce. (*Id.* at PageID.614–616.) He further testified that Glock firearms and Smith & Wesson firearms are not

manufactured in Michigan. (*Id*. at PageID.618.) But he too admitted that he was not supplied with a firearm. (*Id*. at PageID.619.)

Smith says his counsel was deficient for not cross-examining these experts "to show that there are these Glock look-alikes that buyers commonly assemble themselves, can purchase from other companies, or create with 3D printing." (ECF No. 69, PageID.764.) It is well established, however, that "the Sixth Amendment guarantees reasonable competence, not perfect litigation." *Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004); *Munoz*, 605 F.3d at 381. And the scope and content of cross-examination falls squarely within a trial counsel's strategic decision-making. *See, e.g., Bailey v. United States*, No. 14-5657, 2015 U.S. App. LEXIS 23770, at *4 (6th Cir. July 15, 2015). Smith's counsel established on cross-examination that the experts could not definitively identify the firearm—which plainly leaves open the possibility that the firearm was a homemade or "ghost" gun.

But even if one assumes that counsel erred in some way, Smith has not shown that, but for counsel's error, the result would have been different. *See Strickland*, 466 U.S. at 694. Indeed, the possibility that Smith might have purchased a kit with firearm components and manufactured the gun himself in Michigan does not alter the fact that the recovered shell casing traveled in interstate commerce. Nor has Smith shown that a "Glock look-alike" would be able to make firing pin impressions like a Glock or Smith & Wesson. Smith's defense to being a felon in possession of a firearm was that the shooting incident never occurred—i.e., that he never possessed

a firearm. Not that he possessed a firearm but it might not have traveled in interstate commerce.  And pursuing only the former defense was a reasonable trial strategy.

Pursuing only the former defense also provides a reasonable explanation for counsel's failure to call his own firearm expert. But Smith says this too was deficient performance. Not only should his counsel have cross-examined the government's experts on these issues, says Smith, but he also should have called an expert from ATF or his own firearm expert to testify "that there are these Glock look-alikes that buyers commonly assemble themselves, can purchase from other companies, or create with 3D printing." (ECF No. 69, PageID.764.) In support, Smith relied on Wikipedia, a *New York Times* article, and Internet instructions for building a firearm that looks like a Glock. (*Id.* at PageID.763–764.) His opening brief, however, as noted by the government, "provided no evidence of an expert capable and willing to testify to the information he avers, nor [did] Smith proffer what such an expert's testimony would be." (ECF No. 74, PageID.888.)

The Court is not required to engage in "unguided speculation into the value of omitted testimony by hypothetical witnesses." *United States v. Holt*, No. 95-5173, 1996 WL 262466, at *9 (6th Cir. May 15, 1996). In other words, "a claim of ineffective assistance for failing to call witnesses cannot be based on mere speculation." *Carson v. United States*, Nos. 22-3386/3419, 2023 U.S. App. LEXIS 1239, at *1 (6th Cir. Jan. 18, 2023) (citing *Clark v. Waller*, 490 F.3d 551, 557 (6th Cir. 2007) (concluding that petitioner could not show prejudice arising from counsel's failure to call a particular

witness when "he has offered no evidence, beyond his assertions, to prove what the content of [the witness's] testimony would have been")).

To try to fix this problem, Smith attached to his reply brief an affidavit from a proposed expert. (ECF No. 83-2.) This is not a viable cure. First, revealing an expert opinion for the first time in a reply brief is not proper. *See Sundberg v. Keller Ladder*, 189 F. Supp. 2d 671, 682–83 (E.D. Mich. 2002) ("[I]t is not the office of a reply brief to raise issues for the first time." (citing *United States v. Perkins*, 994 F.2d 1184, 1191 (6th Cir. 1993))). Second, "whether to hire an expert" is one of a lawyer's strategic decisions that is entitled to a presumption of reasonableness. *Dunn v. Reeves*, 141 S. Ct. 2405, 2410 (2021) (per curiam) (citation omitted); *see also Esparza v. Sheldon*, 765 F.3d 615, 624 (6th Cir. 2014) (rejecting petitioner's argument that his attorney could have "impeached [an adverse witness] more effectively by calling an expert" because "[t]his is precisely the sort of tactical judgment *Strickland* counsels against second-guessing"). Smith's counsel opted to cross-examine the government's experts rather than suggest that Smith only possessed a privately made firearm or a "ghost gun." Counsel could reasonably have believed that he was in a better strategic position by not calling his own expert who could be subject to damaging cross-examination. *See Samatar v. Clarridge*, 225 F. App'x 366, 372 (6th Cir. 2007) ("[T]he failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel . . . even if the wisdom of such an approach is debatable."). What is more, it would also seem that testimony from an expert that a firearm could be a homemade gun that does not satisfy the interstate nexus requirement is applicable

18

in virtually every felon in possession case in which the firearm was not recovered. Yet Smith cites no cases in which a court found deficient performance for failing to call such an expert.

And, for reasons already stated, counsel's decision not to call a firearm expert did not "undermine confidence in the outcome" of Smith's trial. *Strickland*, 466 U.S. at 694. The affidavit of Smith's newly proposed expert does not address the guns that could have made the firing pin impressions on the recovered ammunition or the interstate nexus of that ammunition.

* * *

In sum, in evaluating Smith's claims about the witnesses his trial counsel did not call, the Court is mindful of the Supreme Court's warning that:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after trial . . . and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

*Strickland*, 466 U.S. at 689. Reviewing counsel's decisions through this lens of deference, the Court finds no basis for a new trial.

## B.

Apart from the witness issues, Smith says he is entitled to a new trial because the Court's jury instruction on unanimity was erroneous.

19

After explaining the elements of a felon in possession charge, the Court separately instructed the jury, as requested by the government, that "with respect to the second element of Count One (that the defendant, following his conviction, knowingly possessed a firearm or ammunition), you do not have to be in unanimous agreement about whether the defendant knowingly possessed a firearm or ammunition as long as each of you find that he was in knowing possession of either a firearm or ammunition." (ECF No. 48, PageID.323.) Smith does not appear to dispute that, in general, this is an accurate recitation of the law.

"[A] jury in a federal criminal case cannot convict unless it unanimously finds that the Government has proved each element." *Richardson v. United States*, 526 U.S. 813, 817 (1999); *see also* Fed. R. Crim. P. 31(a). But "a federal jury need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime." *Richardson*, 526 U.S. at 817. In other words, while a jury must agree that an element is met, a jury need not unanimously decide the "brute facts" or "means" that make out that element. *United States v. Hendrickson*, 822 F.3d 812, 822–23 (6th Cir. 2016). In the context of a felon-in-possession charge, the Sixth Circuit has found, for example, that the particular firearm possessed is not an element of the crime but is instead the means used to satisfy the element of "any firearm." *United States v. Pratt*, 704 F. App'x 420, 426–427 (6th Cir. 2017) (citing *United States v. DeJohn*, 368 F.3d 533, 542 (6th Cir. 2004)). "Thus," says the Sixth Circuit, "the fact-specific rule is that no unanimity instruction

20

is required where multiple firearms charged in a single count were discovered as part of the same transaction." *Id*. (quoting *DeJohn*, 368 F.3d at 540). This rule has been applied as well to cases involving the single possession of firearms and ammunition. *See, e.g., United States v. Lamb*, 162 F. App'x 889, 893 (11th Cir. 2006); *United States v. Korey*, No. 14-108, 2015 U.S. Dist. LEXIS 65373, at *13–14 (W.D. Penn. May 19, 2015).

But the Sixth Circuit has also recognized an exception to this rule: "when the particular factual circumstances create 'a genuine risk that the jury is confused or that a conviction may occur as the result of different jurors concluding that a defendant committed different acts,' a jury unanimity instruction is still required." *Pratt*, 704 F. App'x at 542 (citation omitted). Smith's contention is that this exception applies and thus the instruction was erroneous. But this case involved a discrete act at a particular time in a particular location with one gun and one shell casing. As the government explained it, "Smith's possession of the firearm and the ammunition was a single act: shooting the firearm. Indeed, he could not logically possess one without the other, and therefore no risk of confusion existed." (ECF No. 74, PageID.889.) In these circumstances, a unanimity instruction was not required. *See United States v. Cook*, 290 F. App'x 874, 884 (6th Cir. 2008). ("Because the ammunition and firearms charged in the single count were all discovered as part of the same transaction, the district court committed no error by not giving a specific unanimity instruction."); *Pratt*, 704 F. App'x at 426–27 (no risk of confusion where the firearms were all found in the same bedroom).

Resisting this conclusion, Smith says the applicability of the "confusion exception" is established by government counsel's statement during the jury charge conference that "I do have concerns that a jury could say well, maybe we have questions about the interstate nexus of the firearm, but we don't have any issue about the ammunition." (ECF No.64, PageID.635.) But that does not reveal any potential jury confusion about Smith committing multiple acts. *See Korey*, 2015 U.S. Dist. LEXIS 65373, at *14 (rejecting jury confusion argument "because Korey's possession of the items seized by the probation office . . . constitutes a single offense as charged in count one, and the possession of a *particular* firearm or ammunition is not an element of the offense, the jury is not required to be unanimous with respect to the item he possessed"). Moreover, as given, the instructions here required the jury to be unanimous on the interstate commerce element.

The jury instructions as a whole accurately reflected the law. So Smith's claim of jury instruction error does not warrant a new trial.

## C.

Smith's final argument for a new trial can be more easily disposed of. Smith contends that without the gun or knowing which type of gun fired the spent casing, the verdict was against the manifest weight of the evidence. (ECF No. 64, PageID.771.) More specifically, he argues the government "did not have real proof beyond a reasonable doubt that the alleged firearm crossed a state line." (ECF No. 83, PageID.993.) A lack of proof, however, seems to be more of a challenge to the sufficiency of the evidence than the weight of the evidence.

In any event, "[i]n evaluating a Rule 33 motion based on the weight of the evidence, unlike a sufficiency claim, 'the trial judge can consider the credibility of the witnesses and the weight of the evidence to [e]nsure that there is not a miscarriage of justice. It has often been said that he/she sits as a thirteenth juror.'" *United States v. Solorio*, 337 F.3d 580, 589 n.6 (6th Cir. 2003) (citation omitted). The Court should exercise its discretion to grant a new trial "only in the extraordinary circumstances where the evidence preponderates heavily against the verdict." *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988) (citation omitted).

Firearm and ammunition experts Szymoniak and Pharr testified credibly that the gun that likely fired the cartridge casing left on Yolanda James' driveway, as well as the ammunition itself, were manufactured outside of Michigan. It is true that Szymoniak also testified that a large number of firearms could have fired the casing. But she did not testify these other guns were manufactured in Michigan. Nor was any other evidence presented to suggest the firearm or ammunition was manufactured in Michigan. So the jury's finding that the interstate commerce requirement was satisfied was not against the manifest weight of the evidence.

## V.

For all of these reasons, Smith's motion for new trial is DENIED.

SO ORDERED.

Dated: December 19, 2023

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE